[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this marital dissolution action, the parties have disputes CT Page 5276 concerning alimony, the distribution of assets, and the payment of fees. Based on the trial evidence, the court makes the following findings and orders.
The allegations of the complaint have been proven as true. Accordingly, a decree may enter dissolving the marriage on the basis that it has broken down irretrievably. The defendant's request to assume her mothers birth name of Cotter is granted.
The plaintiff resides at 41 Robin Road in West Hartford. He is a forty year old college graduate in apparent good health. He is presently employed by the Oracle Corporation as a computer software salesperson. His gross annualized earnings, including salary and anticipated commissions, and monthly car allowance total approximately one hundred and twenty-nine thousand ($129,000) dollars. When he was first employed by Oracle in 1998, the company estimated that his total annual earnings, including car allowance and bonus, would be approximately one hundred and fifty thousand ($150,000) dollars. Prior to this employment, the plaintiff worked for Sun Micro Systems where he earned approximately one hundred eighty-four thousand ($184,000) dollars a year in 1997. He left Sun voluntarily and began employment with Oracle in March, 1998 with the anticipation that his earnings will eventually at least match the level he enjoyed at Sun. When the parties were married in 1987, the plaintiff was earning approximately sixty-three thousand ($63,000) dollars annually. The plaintiff has a 401k plan with an account balance of approximately forty-seven thousand ($47,000) dollars, net of a thirty thousand ($30,000) dollar loan the plaintiff borrowed from the plan during the pendency of this action. The court notes the plaintiff also borrowed approximately nine thousand, six hundred and eighty-eight ($9,688) dollars from a C.M. Life Universal Life policy while this action has been pending.
Mr. O'Keefe also participates in an Employee Stock Purchase Plan through his present employer. The asset value of this account as of November 29, 1998 was seven thousand, eight hundred and twenty ($7,820) dollars. Through a former employer, Memorex, the plaintiff has an interest in a defined benefit pension plan from which he has the right to receive five hundred and sixty ($560) dollars a month at retirement age. The plaintiff testified credibly that because the plan was underfunded his ultimate receipt of the full amount of this pension is uncertain.
The defendant is a forty-three year old college graduate, CT Page 5277 presently unemployed, with a sporadic history of employment. She presently resides at her mothers home in West Hartford. While in good physical health, she suffers from Obsessive Compulsive Disorder (OCD), and Obsessive Compulsive Personality Disorder, an illness which has negatively impacted on her ability to successfully maintaiii employment and which has interfered with her interpersonal relationships. At the time of the marriage, she was employed at Coleco Industries earning approximately twenty-three thousand ($23,000) dollars a year. She has held a series of positions, last working for ES Technologies and earning approximately twenty-five thousand ($25,000) dollars a year.
Though the defendant has episodically had OCD symptoms for most of her life, they were not pronounced during the parties courtship, and the illness was undiagnosed until the defendant began treatment in 1990 with John Cline, Ph.D. at the Institute of Living in Hartford. Whether the defendant was insufficiently committed to her treatment with Dr. Cline or the treatment was not properly focused, Mrs. O'Keefe did not enjoy improvement of her symptoms during the marriage. In fact, they worsened. She was inconsistent in her behaviors and occasionally violent toward the plaintiff. For his part, the plaintiff tried to be supportive of the defendant for most of the marriage until the parties final separation in the fall of 1997.
The defendant's condition was evaluated by James Black, M.D., a psychiatrist with a practice in West Hartford. Dr. Black testified that OCD is a chronic illness with a constellation of characteristics including obsessive thinking and ritualistic behaviors. He described the manifestation of its symptoms as ebbing and flowing, and the illness as one which can interfere with relationships, occupation, and emotional stability. From history, Dr. Black described the defendant's illness as existing since she was about seven years old and manifest in varying decrees in frequency and form over the years. He diagnosed the defendant as having nearly lifelong obsessive compulsive disorder with greater intensity over the past several years. The plaintiff's recitation of the defendant's fixation on cleanliness fits the description of behaviors defined by Dr. Black as OCD symptoms. So, too, are personality behaviors which have negatively impacted on her ability to successfully remain employed. Dr. Black agreed that the presentation of these symptoms likely made the defendant a difficult mate, a person with whom it was difficult to live. Describing the defendant as very bright, Dr. Black attributed her inability to keep a job to CT Page 5278 dysfunction attendant to OCD.
With respect to the defendant's employability, Dr. Black expressed optimism that the defendant could become successfully employed following a course of therapeutic intervention for her OCD and attendant depression. With the assistance of appropriate medications and weekly therapy sessions, Dr. Black opined that the defendant could resume employment within several months and that in the next eighteen to twenty-four months she could see significant improvement in her interpersonal relationships and her general sense of well-being. He stated that active treatment could possibly be no longer necessary after approximately five years if she engages and remains committed to therapy. He warned, however, that resistence to treatment is one characteristic of OCD and that the defendant's course could be particularly difficult because she is an adult. Dr. Black projected the cost of treatment to be approximately thirty-seven thousand, five hundred ($37,500) dollars, assuming weekly sessions for the next five years.
When the parties were first married, they lived in a condominium in West Hartford purchased by the defendant prior to the marriage. Later they bought a home on Stoner Drive, West Hartford for three hundred and twenty-five thousand ($325,000) dollars with a mortgage of two hundred and forty thousand ($240,000) dollars. The defendant contributed approximately sixty thousand ($60,000) dollars and her parents provided another ten thousand ($10,000) dollars toward the purchase. The balance of funds required to close came from the plaintiff as borrowing from his 401k plan. In November, 1998, the parties sold the Stoner Road property for three hundred and fifty thousand ($350,000) dollars. The parties presently hold the sum of sixty thousand ($60,000) dollars in escrow from the sale of the Stoner residence. From this amount, they agree that the defendant is entitled to a credit of five thousand ($5,000) dollars. They also agree that the plaintiff should bear the cost of furniture storage up to the date of the marital dissolution hearing.
The defendant has a partnership interest in the Oak Harbor Limited Partnership which was created in August, 1995, shortly after the death of the defendant's father. The defendant's initial contribution to the partnership was approximately one hundred and fourteen thousand ($114,000) dollars, and was derived by way of inheritance from her fathers estate and from rental payments received as a result of her interest in a commercial CT Page 5279 building known as 90 Washington Street. Partnership assets consist of marketable securities with a present market value of approximately three million, two hundred and ninety-five thousand ($3,295,000) dollars. By the terms of the partnership agreement, none of the partners has the right to receive present distributions. Additionally, the sale of partnership interests is restricted. A partner has the right to transfer his or her interest to a buyer subject to the right of first refusal in the partnership, and if the partnership exercises this right, it has sixty months in which to pay the departing partner. Based on the present value of the assets held by the partnership, its historic rate of growth, and the defendant's percentage of ownership, the present value of her share was estimated by an accountant to be approximately sixty-two thousand ($62,000) dollars. While a determination of the present value of the defendant's interest in this asset is difficult because of the buy-out restrictions, her ownership represents the opportunity for the future acquisition of assets and income.
The defendant is a beneficiary of her father's estate. By the terms of the will, the defendant is entitled to receive a distribution of two hundred thousand ($200,000) dollars. To date, she has received one hundred thousand ($100,000) dollars of this amount. While the value of the defendant's father's estate was listed as approximately two million, three hundred and forty-six thousand ($3,346,000) dollars, and thus appears substantial, receipt by the defendant of the balance of her inheritance is uncertain because of pending claims against the estate relating to property located at 90 Washington Street, Hartford. The defendant, her sister, and their parents jointly owned the Washington Street property on which there was a mortgage of approximately three and one half million ($3,500,000) dollars. Following the death of the defendant's father in 1995, the Bank of Boston sought foreclosure of this mortgage in the Hartford Superior Court. That action, which is still pending, bears Docket Number CV 960565689S. By pleading dated November 20, 1998 the parties to the foreclosure action, including the defendant, entered a stipulation for a strict foreclosure, reserving the issue of the amount, if any, of the deficiency, but agreeing that the defendant would not be personally liable on the underlying note. While it appears that the defendant will not be required to pay any deficiency, the amount of any deficiency could jeopardize the defendant's receipt of the balance of funds due her from her fathers estate. Additionally, the conclusion of the foreclosure law suit is likely to bring negative tax consequences to the CT Page 5280 defendant. During the marriage she and the plaintiff claimed depreciation regarding Washington Street on their annual tax returns. Coincidental to the resolution of the foreclosure, the defendant may be exposed to capital gains taxes or a tax relating to the forgiveness of debt. This obligation will be reduced, however, because the defendant sustained tax losses greater than she could claim during the marriage due to her ownership interest in this building. These losses, in the approximate sum of thirty-eight thousand ($38,000) dollars will be available to partially offset any taxes for which the defendant may ultimately become liable as a result of the disposition of 90 Washington Street.
Both parties are beneficiaries of a life insurance trust which insures the life of the defendant's mother. While the parties have certain withdrawal rights in regard to this trust, the defendant's mother is not obligated by any instrument to keep this policy current.
The defendant has paid approximately forty-two thousand ($42,000) dollars in counsel fees to date, and has received invoices for an additional twenty-seven thousand ($27,000) dollars. A portion of the defendant's fees has been paid by her mother. For his part, it appears that through December 1998, the plaintiff incurred legal fees and costs totaling approximately twenty-seven thousand, eight hundred ($27,800) dollars, with a then outstanding balance of approximately fifteen thousand ($15,000) dollars.
The marriage has been troubled from the onset. Though the defendant suffered from OCD for most her life, her illness was undiagnosed prior to the marriage, and her symptoms were in abatement during the parties courtship. Not long after the marriage, her condition deteriorated and her symptoms flourished. Her ritualistic behaviors and compulsions, especially regarding cleanliness and the need to control, made living with her difficult. The parties sold the condo and moved into a substantially larger home to accommodate the plaintiff's felt need for more space, but the move was unsuccessful. Perhaps connected to OCD, the defendant vacillated about whether she shared the plaintiff's desire to have a child, ultimately deciding that she did not. The parties first separated in 1993, then reconciled, and parted finally in 1997. The failure of the marriage was not the fault of either party. However inadequately, each tried to make it work. In the end, the parties' ignorance CT Page 5281 about the defendant's long undiagnosed condition, the behaviors it caused, and the frustration and emotional gulf that ensued, all contributed to the denouement of the marital union.
Both parties agree that the defendant should receive alimony. The plaintiff proposes to pay ten thousand ($10,000) dollars a year for three years; the defendant seeks approximately sixty-two thousand ($62,000) dollars a year for an indefinite term. In fixing the amount and duration of alimony, the court is guided by the dictates of Connecticut General Statute 46b-82 as applied to the trial evidence. With respect to the plaintiff's earnings, while he has a history of earning more in the past than his present total compensation, he undertook his present employment in the expectation that it would yield substantially equal earnings to him. The fact that his prospects may be bright is not alone, however, sufficient reason to base the amount of an alimony order on his capacity as demonstrated by past earnings rather than his present level of compensation. His attainment of a significantly higher level of compensation during the period of alimony may, of course, constitute a substantial change in his financial circumstances. In fixing the amount of alimony, the court is mindful that in her present living circumstances the defendant does not have significant expenses. However, the court has considered not only the reasonable expenses of the defendant, but the court finds that the plaintiff has some continuing duty to provide the defendant with a level of support which will enable her to enjoy a reasonable life style while she prepares herself, through adherence to a therapeutic regime, for eventual self sufficiency. Additionally, in fixing the amount of alimony, it is not the court's quest to equalize the parties disposable incomes.
With respect to the duration of alimony, while the plaintiff's illness makes her future economic viability uncertain, the court's assessment of Dr. Black and Dr. Cline's testimony is that if the plaintiff commits herself to therapy, including adherence to the behavioral and medical prescriptions of her therapist, she should be able to return to work within several months, and she should enjoy substantial improvement within two years, and within five years she could be free of disabling symptoms. In fixing the term of alimony, the court has credited this evidence along with other relevant trial evidence in light of the statutory factors relating to alimony. While the court believes that a term of limited duration is appropriate, the court specifically declines to make either the term or the CT Page 5282 amount non modifiable. However, the outside term should be subject to modification by extension only upon proof that the defendant has sought to fulfill her obligation to faithfully adhere to her OCD-related therapies, and upon proof that she has not been able to secure and maintain employment commensurate with her education and employment background. As alimony, the plaintiff is ordered to pay the defendant the weekly sum of eight hundred ($800) dollars for a period of two hundred and sixty (260) weeks, to terminate upon the earlier death of either party or the defendant's remarriage. The provisions of C.G.S. 46b-86
(b) shall pertain to this order. Additionally, the defendant may continue as an insured under the terms of the plaintiff's employment-related health insurance program, at her cost, for as long as pemitted by applicable statute.
The plaintiff's affidavit and documentary evidence indicate that the plaintiff has substantial life insurance on his life at minimal cost to himself. The plaintiff is ordered to maintain a sufficient amount of life insurance on his life, unencumbered by loans, with the defendant as beneficiary during such time as he is obligated to pay alimony to her in an amount sufficient to pay the then present value of his remaining alimony obligation at the time of his death.
With respect to the division of assets, by Qualified Domestic Relations Order, the defendant shall be entitled to one half the benefit to which the plaintiff is entitled in the Sun Microsystems defined benefit pension plan. Counsel for the plaintiff shall prepare the appropriate order. Additionally, the plaintiff shall transfer the sum of eighteen thousand ($18,000) dollars from his 401k account to an IRA account in the defendant's name. The proceeds from the sale of the Stoner Road residence shall be divided with the plaintiff receiving two-thirds and the defendant one-third of the total.[1] From the defendant's portion, he shall reimburse the plaintiff the sum of five thousand ($5,000) dollars as agreed by the parties. Additionally, he shall pay the cost of storage up to the last hearing date as agreed by the parties and stipulated at the time of trial.
The court approves the terms of the written stipulation made by the parties regarding household furniture and furnishings. Orders may enter in accordance with the terms of the stipulation.
With the exception of orders made herein, each party shall be CT Page 5283 entitled to exclusive ownership and possession of the personal property owned by each as recited on their respective financial affidavits, and each shall be liable for the debts reflected on his and her financial affidavit, and shall hold the other harmless therefrom.
The plaintiff shall pay to the defendant, as counsel fees, the sum of ten thousand ($10,000) dollars within ninety days of this judgment.
In fashioning these awards, the court has considered the criteria set forth in C.G.S. 46b-81, C.G.S. 46b-82, and C.G.S.46b-62 and the trial evidence.
Counsel for the plaintiff shall prepare the judgment file.
Bishop, J.